**EXXON COMPANY; Exxon Shipping Company, Plaintiffs–Counter–Defendants–Third–Party Defendants–Appellants,**

v.

**SOFEC, INC., Defendant–Counter–Claimant–Appellee.**

**PACIFIC RESOURCES, INC.; Hawaiian Independent Refinery, Inc.; PRI Marine, Inc.; PRI International, Inc., Defendants–Cross–Claimants–Third–Party Plaintiffs–Appellees,**

v.

**Griffin WOODHOUSE, Griffin Woodhouse, Inc., Third–Party Defendant–Appellee,**

**Bridon Fibres and Plastics, Ltd., Defendant–Third–Party Defendant–Appellee.**

No. 94–15806.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 14, 1995.

Decided April 26, 1995.

Shirley M. Hufstedler, Hufstedler & Kaus, Los Angeles, CA, for plaintiffs-counter-defendants-third-party defendants-appellants.

George W. Playdon, Jr., Reinwald, O'Connor, Marrack, Hoskins & Playdon, Honolulu, HI, for defendants-cross-claimants-third-party plaintiffs-appellees Pacific Resources, Inc., Hawaiian Independent Refinery, Inc., PRI Marine, Inc., PRI Intern., Inc.

David W. Proudfoot, Belles Graham & Proudfoot, Lihue, HI, for defendant-third-party defendant-appellee Bridon Fibres and Plastics, Ltd.

Before: CANBY, WIGGINS, and T.G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

## OVERVIEW

Exxon Shipping Co. and Exxon Company U.S.A. (collectively, "Exxon") appeal the district court's judgment following a bench trial in Exxon's admiralty action seeking damages for loss of its tanker, the Exxon *Houston*, and costs of oil spill cleanup and loss of cargo. Exxon maintains that the failure of a Single Point Mooring System ("SPM") manufactured by defendant Sofec and sold by defendants Pacific Resources, Inc. and associated corporations (collectively, "HIRI"[1]) was the actual and proximate cause of its losses. The district court found in Phase One of a bifurcated proceeding that Exxon's negligence superseded any damage caused by the failure of the SPM, and was the sole proximate cause of the *Houston*'s stranding. On appeal, Exxon argues that the district court improperly bifurcated the proceedings and that the doctrine of superseding cause

---

1. We follow the district court's designation of the defendant corporations, which include Pacific Resources, Inc., Hawaiian Independent Refinery, Inc., PRI Marine, Inc., and PRI International, Inc., as "HIRI."

has no application to cases in admiralty. We affirm the district court's order.

## FACTS

This case arises from the stranding of the Exxon *Houston* on March 2, 1989, near the Island of Oahu, several hours after it broke away from an SPM owned and operated by defendants HIRI. The *Houston*, a steam propulsion oil tanker weighing over 72,000 dead weight tons, was engaged in delivering oil via two floating hoses into HIRI's submerged pipeline, pursuant to a contract between Exxon and defendant Pacific Resources International, Inc. ("PRII"), when a heavy southern storm (locally termed a Kona storm) caused a break in the chafe chain linking the vessel to the SPM. As the vessel drifted, the two oil hoses broke away from the SPM. Because the hoses were bolted to the ship rather than secured by more readily detachable safety locks, a long (800 feet) length of one hose remained attached to the ship, and interfered with her ability to maneuver.

While the parting of the first hose did not cause a significant threat to the *Houston*, the parting and partial sinking of the second, longer hose, weighed down by a heavy piece of spool torn from the SPM, threatened to foul the ship's propeller. The parting of the second hose at approximately 1728,[2] designated as the "breakout" or "breakaway," is the initiating point in time for events covered in the Phase One trial.

Immediately after the breakout, the Coast Guard contacted the *Houston* to see whether it needed assistance, but because he was advised assistance vessels would not arrive within two hours, *Houston*'s Captain Kevin Coyne refused the offer, thinking the problem would be resolved within that time. Captain Coyne did not thereafter request assistance from the Coast Guard. During the two hours and forty-one minutes following the breakout, Captain Coyne took the ship through a series of phases described in some detail in the district court's findings of

fact. These phases are summarized in the following paragraphs.

At about 1740, Captain Coyne attempted to anchor, dropping a single anchor which paid out one shot (90 feet) of chain. On the basis of expert testimony, the district court found that Captain Coyne failed to follow standard maritime practice, which would have involved releasing five to six shots of chain to hold the ship under the circumstances. The *Houston* had twelve shots of chain available for each of its two anchors. After this attempt to anchor failed, Captain Coyne made no further efforts to anchor the *Houston* before it stranded, although the district court found there were numerous places en route he could safely have done so.

By 1803, the small assist vessel *Nene* was able, with the assistance of the *Houston*, to get control of the end of the second hose so that it was no longer a threat to the larger ship. Captain Coyne controlled the *Nene*'s movements as necessary to coordinate with the *Houston*'s movements. Between 1803 and 1830, Captain Coyne maneuvered the *Houston* out to sea and away from shallow water.

Between 1830 and 2009, the time of stranding, the district court found that Captain Coyne made a series of ill-advised moves. Perhaps most significant was his failure to plot the ship's position on the chart between 1830 and 2004. Rather than plotting fixes of the vessel's position at regular intervals, Captain Coyne relied after 1830 entirely on parallel indexing, a supplemental technique which, according to Exxon's Navigation and Bridge Organization Manual ("Navigation Manual"), "does not relieve the ship's officer of the duty to frequently plot the position of the ship on the chart by means of navigational fixes." Without a fix, Captain Coyne was unable to make effective use of the chart to check for hazards.

Between 1830 and 1947, the crews of the *Houston* and the *Nene* worked to disconnect the second hose from the *Houston*. This was accomplished by 1947. The *Houston*'s port crane collapsed in the process, taking the

---

**2.** The equivalent local time was 5:28 p.m. In keeping with the record, we refer to nautical time in this opinion.

crane operator's seat with it onto the deck. The second mate went below to attend to the crane operator, who was in shock, leaving Captain Coyne alone on the bridge at 1948. Although the Navigation Manual requires that at least two officers be present on the bridge at all times, Captain Coyne did not call upon any of the other available officers to join him until 2000. The district court found that if the bridge had been properly manned, the stranding danger would have been avoided.

Finally, at 1956, Captain Coyne made a disastrous final turn to the right (toward the shore) which resulted in the ship's stranding. Given that the Kona storm was threatening to push the vessel into shore, it is not clear why the Captain chose to turn right instead of continuing to back out safely to sea, or turning to port, away from the coast. Both options were viable. The district court found Captain Coyne's explanations for his decision unconvincing. Because he had not taken fixes, Captain Coyne apparently was unaware of the ship's position until he ordered Third Mate Spiller to do so at 2004. Third Mate Spiller testified that on seeing the 2004 fix on the chart, Captain Coyne uttered an expletive and immediately ordered an increased speed. Moments later the ship ran aground on a reef near the shore.

### PROCEDURAL HISTORY

In April, 1990, Exxon filed its complaint in admiralty against HIRI and Sofec (the manufacturer of the SPM) for the loss of its ship and cargo, and for oil spill cleanup costs. HIRI filed a third-party complaint against Bridon Fibres and Plastics, Ltd. ("Bridon"), and Griffin Woodhouse, Ltd. ("Griffin").[3] On June 3, 1992, Griffin moved to bifurcate the trial. All defendants joined the motion. The district court granted the motion on July 31, 1992, limiting the first phase of the trial to the issue of causation with respect to the *Houston*'s grounding, leaving the issue of causation with respect to the breakout for Phase Two.

After conducting a bench trial in admiralty between February 9, 1993, and March 3,

1993, the district court found that Captain Coyne's (and by imputation, Exxon's) extraordinary negligence was the sole proximate and superseding cause of the *Houston*'s grounding. Exxon filed an appeal on June 16, 1993, which was dismissed for lack of a final judgment. Following motions by Bridon and Exxon, the district court entered a final motion precluding all of Exxon's claims for loss of the vessel on April 20, 1994. We have jurisdiction over Exxon's subsequent timely appeal pursuant to 28 U.S.C. § 1291, and we affirm the judgment.

### ANALYSIS

A. *Applicability of superseding cause in admiralty.*

The district court's conclusions of law are reviewed *de novo*. *Havens v. F/T Polar Mist*, 996 F.2d 215, 217, 1994 A.M.C. 605 (9th Cir.1993). Exxon argues that the Supreme Court's holding in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), replacing the historical divided damages rule in favor of comparative negligence in admiralty cases, vitiates the use of concepts such as intervening force and superseding cause. In *Reliable Transfer*, the Court rejected the rule whereby damages were divided equally between or among negligent vessels (usually in collision cases) regardless of the degree of fault attributable to each. *Id.* at 397, 411, 95 S.Ct. at 1709, 1715–16. In concluding, the Court stated that:

> [W]hen two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only ... when it is not possible fairly to measure the comparative degree of their fault.

*Id.* at 411, 95 S.Ct. at 1715–16.

In the wake of *Reliable Transfer*, the circuits have considered with sometimes conflicting results the issue of whether superseding cause may still be used to attribute

---

**3.** A third company which was dismissed without prejudice.

fault in admiralty cases. In *Hercules, Inc. v. Stevens Shipping Co.*, 765 F.2d 1069 (11th Cir.1985), on which Exxon relies, the Eleventh Circuit appears to have held the doctrine of superseding cause inapplicable in the maritime context after *Reliable Transfer*. Rejecting appellee's argument that its negligence was not a proximate cause of the accident in question, the *Hercules* court stated:

> The doctrines of intervening cause and last clear chance, like those of "major-minor" and "active-passive" negligence, operated in maritime collision cases to ameliorate the ... so-called "divided damages" rule [rejected by the Supreme Court in *Reliable Transfer*]. . . .
>
> Under a "proportional fault" system, no justification exists for applying the[se] doctrines. . . . Unless it can truly be said that one party's negligence did not in any way contribute to the loss, complete apportionment ... is the proper method for calculating and awarding damages in maritime cases.

765 F.2d at 1075.

While *Hercules* was understood by the Eighth Circuit to reject the role of superseding cause altogether in maritime cases, *Lone Star Industries, Inc. v. Mays Towing Co., Inc.*, 927 F.2d 1453, 1458 (8th Cir.1991), it is not entirely clear whether in rejecting intervening cause the Eleventh Circuit meant merely to reject "normal intervening cause" as defined by Restatement (Second) of Torts ("Restatement") section 443, or whether it meant also to reject "superseding cause" as defined by Restatement section 440.[4] Given that the *Hercules* court explicitly ruled that appellee's underlying actions were a proximate cause (as well as a cause in fact) of the damage, it is plausible that the court would not have ruled out a defense based on superseding cause as the sole proximate cause of the damage.

■ It is not necessary to resolve here whether the Eleventh Circuit has proscribed the use of superseding cause in admiralty. Several other circuits, most importantly this one, have affirmed the continuing viability of superseding cause in the maritime context. In *Hunley v. Ace Maritime Corp.*, 927 F.2d 493, 497, 1991 A.M.C. 1217 (9th Cir.1991), we held that an intervening force supersedes prior negligence where the subsequent actor's negligence was "extraordinary" (defined as "neither normal nor reasonably foreseeable"). Thus, a ship's failure to stand by and offer assistance to the sinking vessel with which it had collided was deemed the sole proximate cause of injury to a rescuing vessel's crewman, even though both of the colliding vessels were causes-in-fact of the collision. *Id.* at 496–97. Accordingly, we held the departing vessel "solely responsible" for

4. Section 440 of the Restatement (Second) of Torts defines superseding cause as:

an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

Comment b adds:

A superseding cause relieves the actor from liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm.

Section 441 defines intervening force as:

one which actively operates in producing harm to another after the actor's negligent act or omission has been committed.

Section 443 on "normal intervening force" states that:

[t]he intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm. . . .

Section 442 lays out factors for determining whether an intervening force is a superseding cause:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

Restatement (Second) of Torts §§ 440–42 (1965).

the injuries of the seaman aboard the rescuing vessel. *Id.* at 498. *See also Protectus Alpha Navigation Co. v. Northern Pac. Grain Growers,* 767 F.2d 1379, 1384, 1986 A.M.C. 56 (9th Cir.1985) (indicating in dicta that application of the principle of superseding cause in a maritime case "would not have been improper."); *Nunley v. M/V Dauntless Colocotronis,* 727 F.2d 455, 466, 1984 A.M.C. 2920 (5th Cir.) (indicating that superseding cause might come into play in admiralty), *cert. denied,* 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 63 (1984); *Donaghey v. Ocean Drilling & Exploration Co.,* 974 F.2d 646, 652, 1994 A.M.C. 512 (5th Cir.1992) (holding that "the doctrine of superseding negligence in maritime cases ... retains its vitality"); *and cf. Lone Star,* 927 F.2d at 1458–60 (rejecting the *Hercules* approach and applying superseding cause in a case involving ordinary (as opposed to extraordinary) negligence).

We hereby reaffirm that superseding cause may act to cut off liability for antecedent acts of negligence in admiralty cases where the superseding cause is the result of extraordinary negligence. We therefore hold that the district court did not "disobey" *Reliable Transfer* in employing the concept of superseding cause in this case.

### B. The decision to bifurcate.

The trial court's decision to bifurcate a trial is reviewed for an abuse of discretion. *Counts v. Burlington N. R.R.,* 952 F.2d 1136, 1139 (9th Cir.1991). Rule 42 of the Federal Rules of Civil Procedure provides in pertinent part:

> [t]he court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, ... third party claim, or of any separate issue or of any number of claims ... or issues, always preserving inviolate the right of trial by jury.

Exxon argues that the district court's decision to bifurcate the trial, and to limit Phase One to the issue of causation after the breakout, denied Exxon due process and deprived it of a fair trial by foreclosing it from presenting its case-in-chief. Because it maintains that the issues of causation, from breakout to grounding, are inseverable, Exxon avers that it was unfairly prejudiced by the bifurcation. We do not agree.

The district court assumed at the outset of Phase One that the defendants' negligence was a cause in fact of the grounding. There was thus no need in Phase One for Exxon to establish HIRI's fault in causing the breakout. Rather, Exxon had the burden of proving that the forces set in motion by the breakout were the proximate cause of the grounding. HIRI had the burden of showing by a preponderance of the evidence that Captain Coyne's actions subsequent to the breakout were the sole proximate or superseding cause of the grounding of the vessel, such that the defendant parties were relieved of liability for the *Houston*'s loss.[5]

As the district court noted in its order granting the motion to bifurcate, if it did not find Captain Coyne's navigation after the breakout to be the sole proximate or superseding cause of the grounding, it could "still determine in the first phase of a bifurcated trial the comparative fault (cause) of the grounding as between the breakout and the subsequent navigation of the vessel." The district court noted, too, that it was "well aware of the possibility that the issue of causation with respect to the breakout may still require a second phase of trial, perhaps before a jury." After a lengthy bench trial, the district court found that Captain Coyne's extraordinary negligence was the sole proximate cause of the grounding of the *Houston,* obviating any need to make a comparative analysis of fault regarding the loss of the ship. "The principles of comparative negligence are not applicable when damages can be apportioned to separate causes based on evidence in the record." *Protectus Alpha,* 767 F.2d at 1383.

Exxon also argues that the district court erred in holding that the safe berth clause in the contract between HIRI and Exxon im-

---

**5.** We find Exxon's argument that the district court improperly allocated the burdens of proof to be without merit.

posed a duty of due diligence rather than one of strict liability upon the defendants.[6] Had the district court applied the strict liability standard, Exxon indirectly avers, it could not have bifurcated the trial or upheld HIRI's superseding cause defense. We find it unnecessary to decide here which standard of care is appropriate in this context; even were we to accept Exxon's theory that the HIRI defendants were strictly liable as warrantors of safe berth, such a finding would not render erroneous either the district court's bifurcation of the trial, or its superseding cause analysis.

■ Where, as here, the district court finds the injured party to be the superseding or *sole* proximate cause of the damage complained of, it cannot recover from a party whose actions or omissions are deemed to be causes in fact, but not legal causes of the damage, regardless of whether that party's liability is premised on negligence or strict liability. *See* Restatement (Second) of Torts § 440 cmt. b (1965) ("superseding cause relieves the actor of liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm"); *and see In re Related Asbestos Cases*, 543 F.Supp. 1142, 1150 (N.D.Cal.1982) (holding the defense of superseding cause applicable in cases of strict liability in tort.)

Given the viability of the superseding cause doctrine in cases such as this one, the district court's decision to bifurcate the trial cannot be said to have "severed the unseverable" or to have prejudiced Exxon. Because bifurcation of the trial was expeditious and appropriate in light of the circumstances of this case and did not result in prejudice to Exxon, we hold the district court did not abuse its discretion in choosing to take this approach.

C. *The district court's finding of extraordinary negligence.*

■ A district court's findings of fact are reviewed under the clearly erroneous standard. Fed.R.Civ.P. 52(a); *Campbell v. Wood*, 18 F.3d 662, 681 (9th Cir.), *cert. de-*

*nied*, — U.S. —, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994). This standard applies to findings of fact made by admiralty trial courts. *Havens*, 996 F.2d at 217. "[R]eview under the clearly erroneous standard is significantly deferential, requiring a definite and firm conviction that a mistake has been committed." *Concrete Pipe and Prod. of Cal. Inc. v. Construction of Cal., Inc. v. Construction Laborers Pension Trust*, — U.S. —, —, 113 S.Ct. 2264, 2280, 124 L.Ed.2d 539 (1993) (internal quotations omitted); *see also United States v. Ramos*, 923 F.2d 1346, 1356 (9th Cir.1991). Special deference is paid to a trial court's credibility findings. *Id.* A district court's findings of negligence, including issues of proximate cause, are reviewed under the clearly erroneous standard. *Vollendorff v. United States*, 951 F.2d 215, 217 (9th Cir.1991). This standard of review is an exception to the general rule ·that mixed questions of law and fact are reviewed *de novo*. *Id.* "[D]eterminations of negligence in admiralty cases are findings of fact which will be given application unless clearly erroneous." *Hasbro Industries, Inc. v. M/S St. Constantine*, 705 F.2d 339, 341 (9th Cir.), *cert. denied*, 464 U.S. 1013, 104 S.Ct. 537, 78 L.Ed.2d 717 (1983).

■ Exxon "recognizes the futility of attacking on appeal the district court's finding that Captain Coyne was negligent" because of conflicting expert testimony on that issue, but argues that the district court erred: 1) in finding Captain Coyne's actions to have been extraordinarily negligent; and 2) in finding Captain Coyne's negligence, even if correctly characterized as "gross," to have been the legal cause of the loss.

The district court made detailed findings of fact and conclusions of law after the bench trial. The district court rested its conclusions that Captain Coyne was extraordinarily negligent, and that his negligence was the sole proximate and superseding cause of the ship's grounding, and thus its loss, on its findings that: 1) Exxon had failed to rebut the presumptive admiralty rules of *The Loui-*

---

**6.** Exxon does not dispute the district court's finding that the defendants met the duty of due diligence in all respects.

*siana,* 70 U.S. (3 Wall.) 164, 18 L.Ed. 85 (1865), and *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873); 2) even aside from these presumptions, Captain Coyne acted with extraordinary negligence; 3) Captain Coyne acted slowly and deliberately and thus cannot have been said to have acted "in extremis;" and 4) Captain Coyne's actions constituted a superseding cause of the ship's loss under Restatement section 442 and the law of this circuit.

Under the rule of *The Louisiana,* when a moving vessel strikes a charted reef, it is presumed the vessel is at fault. 70 U.S. at 173. The vessel may rebut this presumption by showing by a preponderance of the evidence that the collision was the fault of a stationary object, that the moving vessel acted with reasonable care, or that the collision was an unavoidable accident. *Id.; see Weyerhaeuser v. Atropos Island,* 777 F.2d 1344, 1347 (9th Cir.1985). Because the *Houston* struck a charted reef, and because Exxon failed to meet its rebuttal burden, the district court concluded that Captain Coyne's navigation was negligent, and that this negligence was a proximate cause of the stranding.

■ *The Pennsylvania* stands for the presumption that when a vessel violates a statutory rule meant to prevent strandings, the violation was a proximate cause of the stranding. 86 U.S. at 136. This presumption can be rebutted by a "clear and convincing showing of no proximate cause." *Trinidad Corp. v. S.S. Keiyoh Maru,* 845 F.2d 818, 825 (9th Cir.1988). The district court found that Captain Coyne's failure to plot fixes between 1830 and 2004, and his failure to call another officer to the bridge between 1948 and 2000, while he stood there alone, violated 33 C.F.R. § 164.11 and § 164.11(a). Because Exxon failed to sustain its burden under the rule, the district court found these statutory violations were a proximate cause of the stranding.

Exxon responds to these findings in a footnote, wherein it notes, with respect to the *Pennsylvania* rule, but without offering any support, that there is no duty to plot fixes in a time of peril, and, with respect to the *Louisiana* rule, that "the Ninth Circuit has questioned whether presumption of fault ap-

plies when the ship strikes a submerged structure." Exxon cites *Grace Line, Inc. v. Todd Shipyards Corp.,* 500 F.2d 361, 366 (9th Cir.1974), in which we "questioned" but did not decide whether the traditional rule would apply in a case where a ship struck a submerged drydock with a hidden recess. *Id.* In the instant case, the *Houston* struck a charted reef because her captain had not bothered to fix her position. The analogy to *Grace Line* is not apt. Exxon neither rebuts nor offers any compelling reason to ignore the traditional admiralty rules laid out in *The Pennsylvania* and *The Louisiana.*

Quite apart from these rules, the district court found that Captain Coyne "acted negligently, unreasonably and in violation of the maritime industry standards" in a number of instances. The court cited his failure to anchor properly, or to make more than one attempt to anchor; his failure to request assistance from the Coast Guard or other available ships; his failure to back the vessel far enough from shore; and his decision instead to linger unnecessarily in the vicinity of shore, only a half mile or so from the actual grounding line.

Because the district court found, partly on the basis of the Captain's own testimony, that Captain Coyne acted with calm deliberation and without the pressure of imminent peril, it held him to the standard of "such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." *Stevens v. The White City,* 285 U.S. 195, 202, 52 S.Ct. 347, 76 L.Ed. 699 (1932). Exxon acknowledges the Captain remained calm, but argues that because the ship was never out of peril, a more lenient standard should have been adopted. Exxon cites no authority on appeal for this proposition. Because the district court's finding that Captain Coyne had ample time in which to reflect and act between 1830 and the time of grounding is well supported by the record, we find that the district court did not err in holding him to a reasonable standard of care.

Finally, the district court found Captain Coyne's negligence not only to be a proximate or legal cause of the stranding, but to be the sole proximate, and thus the supersed-

ing, cause of the ship's loss. On the basis of the testimony of the *Houston*'s crew and expert witnesses, the district court found that "[a]lthough the breaking of the mooring chain imperilled the ship, the EXXON *Houston* successfully avoided that peril. By 1830, [she] was heading out to sea and in no further danger of stranding." The court recognized from the start that the *Houston*'s reaching a point of safety was not by itself enough to break the chain of events set in place by the breakout. Under Restatement sections 442 and 447, as adopted by this Circuit, *Hunley,* 927 F.2d at 497, the Captain's actions after reaching this point of safety would have to be extraordinarily negligent to be deemed a superseding cause cutting off the liability of the defendants. The district court specifically found Captain Coyne's negligence to be extraordinary with respect to the failure to fix and plot the ship's position after 1830, and the decision to make the final starboard turn. The court also found the fact that the ship grounded almost three hours after the breakaway "was highly extraordinary rather than normal."

Exxon argues that the court's findings of extraordinary negligence are erroneous, maintaining that none of the Captain's decisions were outside the range of discretion or "so bizarre" as to be unforeseeable, and that "the only command that lead [sic] the tanker to strand was the [right] turn order." Exxon also argues that it was unnecessary for the Captain to plot fixes because he knew his position by parallel indexing and there would have been no room on the chart to plot fixes. Finally, Exxon argues that the Captain's concern about the injured crane operator made him anxious.

Exxon interprets Captain Coyne's actions as dependent intervening, and thus not superseding, forces under Restatement section 441. Essentially, Exxon argues that all of the Captain's actions were reactions to the breakout, and thus cannot be reviewed independently. Exxon relies on *Kinsman Tran-*

*sit Co.,* 338 F.2d 708, 723–26 (2d Cir.1964), *cert. denied,* 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965), for the proposition that failure to foresee danger will not excuse liability. The case is inapposite. *Kinsman* concerned liability for injuries arising from the drifting of an unmanned vessel after it came unmoored. In the portion of the case cited by Exxon, the court deemed it was foreseeable that an unmanned ship turned loose by a faulty mooring device would come to harm or collide with other vessels. *Id.* The *Houston* was not an unmanned vessel, but one fully manned by and directed by a captain who was capable of getting her to safety before grounding her by his own acts.[7]

The district court's findings that Captain Coyne's failure to take fixes was extraordinarily negligent is supported by the record. All of the expert witnesses, including Exxon's, testified that it was imprudent and contrary to industry standards for Captain Coyne not to plot fixes after 1830. The record does not support Exxon's contention that plotting fixes would have obliterated the chart. Captain Coyne made no such claim; he explained that he did not plot fixes because he felt it was unnecessary to do so. He believed that he could adequately assess the ship's position through parallel indexing. Exxon's assertion that parallel indexing was sufficient is also contradicted by all of the witnesses, including Exxon's. Captain Coyne's sole reliance on parallel indexing was, moreover, contrary to Navigation Safety Regulations, 33 C.F.R. § 164.11, and to Exxon's own Navigation Manual.

The district court's finding that the final starboard turn was extraordinarily negligent is also supported by the record. Captain Coyne stated that he wanted to get away from shore, but the turn right took him toward shore. As for his concern with the hose and danger of collision with the *Nene,* it is undisputed that Captain Coyne made no effort to ascertain the position of the *Nene.* The district court properly rejected the Cap-

---

7. *Kinsman* rejects the doctrine of last clear chance under which the trial court had excused the moorers (and the shipowner) from liability. 338 F.2d at 719. While Exxon has analogized superseding cause doctrine to last clear chance, that argument fails, and *Kinsman* does not res-

cue it. HIRI was not absolved of fault because Exxon had the "last clear chance" to avoid danger, but because the district court found that Exxon's independent and extraordinarily negligent actions were the sole legal cause of the stranding.

tain's argument that he could not continue to back up because of his concern for Denton, the injured crane operator, as the man was in fact not seriously injured, no one called upon the Coast Guard or other available ships for assistance in a supposed medical emergency, and the Captain's own testimony that his concerns for Denton did not in fact cause him to do anything he would not otherwise have done.

In sum, the district court found that Captain Coyne had ample time, as well as opportunity and available manpower, to take precautions which would have eliminated the risk of grounding, and that his failure to do so amounted to extraordinary negligence, superseding any negligence of the defendants with regard to the breakout or provision of safe berth after the breakout. Because the district court's findings are well supported by the record, we hold they are not clearly erroneous.

## CONCLUSION

We hold the district court did not err in finding Captain Coyne's extraordinary negligence to be the sole proximate and superseding cause of the damage to the *Houston*, and we

AFFIRM.